UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| GLASSELL DEVELOPMENT, INC., et al., | SA CV 08-208 AHS(ANx) |
| Plaintiffs, | |
| v. | STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF SUMMARY JUDGMENT IN FAVOR OF NIC INSURANCE COMPANY |
| NIC INSURANCE COMPANY, et al., | |
| Defendants. | |
| NAVIGATORS SPECIALTY INSURANCE COMPANY, etc., | |
| Counter-Claimant, | |
| v. | |
| GLASSELL DEVELOPMENT, INC., et al., | |
| Counter-Defendants. | |

**I.**

**INTRODUCTION**

The Court, having read and considered the parties' submissions and the record, issues this statement of the facts which are uncontroverted or as to which there is no substantial controversy, as well as the conclusions of law that follow therefrom. This statement is based primarily on the Defendant and Counter-Claimant NIC Insurance Company/Navigators Insurance Company ("NIC") submission pursuant to Local Rule 56-1 in support of its Motion for Summary Judgment ("Motion") as to the Second Cause of Action (Rescission) in the Counterclaim.

**II.**

**UNCONTROVERTED FACTS**

**A.      Representations in Applications**

1.   On June 28, 2002, John Glassell ("J. Glassell") signed a Contractors Supplemental Questionnaire (application), which his broker submitted on his behalf, seeking an insurance policy from NIC (NIC and its successor Navigators Specialty Insurance Company are referred to as either NIC or Navigators). The insurance application seeks coverage effective July 1, 2002 on behalf of "Glassell Development Incorporated DBA: Glassell Construction." The application is attached as Exhibit 1[1] to the

---

[1] J. Glassell testified that he signed the 2002 application. By stipulation, the parties have agreed that J. Glassell submitted the subsequent applications, or the applications were submitted by J. Glassell for insurance, and that the NIC policies were issued in reliance thereon. (See excerpts to Deposition of Andrew Glassell ("A. Glassell") attached as Exhibit 1 to Declaration of Gary Selvin, pgs. 107:18-109:3, hereinafter "Selvin Decl. Exh. 1").

Declaration of William Vaughn in Support of Motion for Summary Judgment on Counter-claim, hereinafter referred to as "Vaughn Decl. Exh. 1."

2.   J. Glassell submitted applications for insurance for each policy annually thereafter, seeking coverage from July 1, 2003 to July 1, 2006. Copies of those applications are attached as Exhibits 2, 3, 4, and 5 to Declaration of William Vaughn. The questions posed in each of the applications are the same; the responses are substantively virtually identical. Glassell Development, Inc. d.b.a. Glassell Construction (also called GDI) is referred to as the applicant. Because the questions and answers in the applications are materially indistinguishable, reference is made to the answers in Vaughn Decl. Exh. 1.

3.   The applicant represents he is an artisan subcontractor who performs work on small projects, including patios, fireplaces, and concrete foundations for single-family dwellings. (Vaughn Decl. Exh. 1, pg. 5, question 10.) Zero percent of the work is as a general contractor (Vaughn Decl. Exh. 1, pg. 4, question 4.)

4.   The applicant represents the largest four projects in the last five years (July 1, 1997-July 1, 2002) range from $95,000-$125,000. All of the large jobs are described as Custom Dwelling, Fireplaces, Patio. (Vaughn Decl. Exh. 1, pg. 5, question 10.)

5.   "The largest three jobs, at the time, likewise, are described as Custom Dwelling, Fireplaces, Patio," and range

1. from $45,000-$65,000. (Vaughn Decl. Exh. 1, pg. 5, question 10.)

2. 6. The applicant represents he subcontracts 1% which is approximately $1200 per year. (Vaughn Decl. Exh. 1, pg. 4, question 5.)

3. 7. The applicant represents he always requires subcontractors to name it as an additional insured, and he requires formal written contracts with subcontractors. Such procedures have been in place for at least the past three years. (Vaughn Decl. Exh. 1, pg. 4, question 5.)

4. 8. The applicant represents the gross receipts for the preceding four years are reported to be $700,000-$900,000 per year. (Vaughn Decl. Exh. 1, pg. 5, question 8.)

5. 9. The applicant represents the greatest number of homes built in any one year was zero. (Vaughn Decl. Exh. 1, pg. 5, question 13.)

6. 10. The applicant represents it has never performed work on hillsides or slopes. (Vaughn Decl. Exh. 1, pg. 7, question 19.)

7. 11. The applicant represents it has never had projects involving retaining walls. (Vaughn Decl. Exh. 1, pg. 7, question 20.)

8. 12. The applicant represents it has never performed, or subcontracted, swimming pool construction, work on gas lines, alarm installation, roofing. (Vaughn Decl. Exh. 1, pg. 8, question 29.)

9. 13. The applicant represents it does not perform work above two stories in height. (Vaughn Decl. Exh. 1, pg. 7, question 22.)

14.     The applicant represents he never has worked or will work as a construction manager for a fee or supervising contractors paid by a different entity.  (Vaughn Decl. Exh. 1, pg. 7, question 25.)

15.     The applicant further states, in response to the question "Do any prior operations differ substantially in nature from the current operations," "NO." (Vaughn Decl. Exh. 1, pg. 5, question 15.)

**B.      Misrepresentations in Applications**

In contrast to the representations set forth in the applications submitted by Glassell Development, Inc. d.b.a. Glassell Construction, as set forth above, there is no genuine dispute that the following represents the true facts.

16.     A. Glassell was a general contractor who built single-family dwelling high-end residences from 1986 through 2000, (Selvin Decl. Exh. 1 pgs. 6-7 [A. Glassell Depo. pgs. 15:19-16:25]) including (a) the construction of the Hao residence, which started in 1996, a nearly 9000-square foot home, on which he was a general contractor, with a construction price of under $2 million.  (Selvin Decl. Exh. 1 pgs. 3-5 [A. Glassell Depo., pg. 6:14-25; pgs. 7:22-8:9]); (b) the Lin house, which was built in 1999-2000,[2] which  involved $2.5 million in the construction costs.  (Selvin Decl. Exh. 1 pgs. 25-28 [A. Glassell Depo. pgs. 79:2-82:11]; Selvin Decl. Exh. 4 pgs. 66-69 [contract with Lin]); (c) the Terajima home in 1998-1999, which involved

---

[2] In the insurance application to Navigators, Glassell Development, Inc. referenced license number 489443.  The Lin contract lists license number 454030.

approximately $1 million in construction costs (Selvin Decl. Exh. 1 pgs. 11-13 [A. Glassell Depo. pgs. 23:3-25:3]); and (d) two single-family dwellings of 7000-8000 square ft., involving construction contracts of between $1 million and $1.5 million each. (Selvin Decl. Exh. 1 pg. 23 [A. Glassell Depo. pg. 59:1-18].)

17. A. Glassell signed the Lin contract (Selvin Decl. Exh. 4, p. 64.)

18. J. Glassell, who signed the application, knew of the Lin project. (Depo. of J. Glassell attached as Exhibit 2 (hereinafter "Selvin Decl. Exh. 2") to Decl. of Gary R. Selvin, Selvin Decl. Exh. 2 pg. 47 [J. Glassell Depo. pg. 16:11-19].)

19. Ninety percent of the Hao Project was subcontracted. (Selvin Decl. Exh. 1 pgs. 16-17 [A. Glassell Depo. pgs. 42:18-43:4].) In addition, 95% of the Lin project was subcontracted. (Selvin Decl. Exh. 1 pg. 17 [A. Glassell Depo. pg. 43:15-17].) Of the Terajima house, 100% of the work was subcontracted. (Selvin Decl. Exh. 1 pg. 17 [A. Glassell Depo. pg. 43:8-10].)

20. In the last five years (July 1, 1997-July 1, 2002) called for in the application (Vaughn Decl. Exh. 1, pg. 5, question 11), Glassell Development, Inc. constructed three homes with construction costs ranging from $1 million-$2.5 million, each.

21. A. Glassell testified that he did not require subcontractors to name Glassell Development, Inc. as an additional insured. (Selvin Decl. Exh. 1 pgs. 38-39 [A. Glassell Depo. pgs. 187:10-188:5.)

22. On the Lin job, which led to Soltani's multimillion dollar lawsuit against Glassell Development, Inc., A. Glassell did not obtain any endorsements from Studio Cast, Battaglia, or any other subcontractors, naming Glassell Development Inc. as an additional insured. (Selvin Decl. Exh. 1 pg. 39 [A. Glassell Depo. pg. 188:7-19]; plaintiff/cross defendants' response to defendant NIC's special interrogatories, set three (numbers 15-19) attached as Exh. 3 to Decl. of Gary R. Selvin, hereinafter "Selvin Decl. Exh. 3" pgs. 55-61.)

23. Although the gross receipts for the preceding four years are reported in the application to be $700,000-$900,000 per year (Vaughn Decl. Exh. 1, pg. 5, question 8), in fact, those were the gross receipts for Glassell Construction's masonry activities, without including Glassell Development, Inc.'s receipts as a general contractor or construction manager. (Selvin Decl. Exh. 2 pg. 53 [J. Glassell Depo. pg. 47:1-4.) (This did not include Glassell's $5.5 million in homebuilding, as noted in paragraph 16, supra.)

24. From 1996 through 2000, Glassell Development, Inc.'s (i.e. A. Glassell's work), alone, was $750,000-$1 million a year. (Selvin Decl. Exh. 1 pg. 14-15 [A. Glassell Depo. pgs. 26:8-12; 26:17-27:2].)

25. Although the applicant said he had never performed work on hillsides or slopes, (Vaughn Decl. Exh. 1, pg. 7, question 19) the Lin house was on a steep hillside, probably a 3:1 grade and, given the steepness, they had a structural engineer. (Selvin Decl. Exh. 1 pg. 8-10 [A. Glassell Depo. pg. 20:4-22].)

26. Glassell Development Inc. built two other Palos Verdes homes on hillsides. (Selvin Decl. Exh. 1 pg. 29 [A. Glassell Depo. pg. 91:4-8].)

27. Whereas in the application, Glassell Development Inc. said it never had projects involving retaining walls (Vaughn Decl. Exh. 1, pg. 7, question 20), the Hao property had a retaining wall (Selvin Decl. Exh. 1, p. 29.) The large homes built in Palos Verdes Estates had "lots of structurally engineered retaining walls," as did the Lin property. (Selvin Decl. Exh. 1 pg. 22-24 [A. Glassell Depo. pgs. 58:23-60:1].)

28. A. Glassell knows that the lawsuit arising from the construction of the Lin home and project includes allegations of failed retaining walls. (Selvin Decl. Exh. 1 pg. 35 [A. Glassell Depo. pg. 164:21-24.)

29. The two houses built in Palos Verdes and the Hao house each had a swimming pool. (Selvin Decl. Exh. 1 pg. 30 [A. Glassell Depo. pg. 98:2-6].)

30. Two houses Glassell Development Inc. built had an alarm system. (Selvin Decl. Exh. 1 pg. 31 [Depo. of A. Glassell, pg. 99:7-11].)

31. Five jobs Glassell Development Inc. built involved subcontractors piping gas. (Selvin Decl. Exh. 1 pgs. 30-31 [A. Glassell Depo., pgs. 98:11-99:6].) Five houses Glassell Development Inc. built had roofing installation subcontracted. (Selvin Decl. Exh. 1 pg. 31 [A. Glassell Depo. pg. 99:14-17.)

32. In the application Glassell Development Inc. represented the applicant never performed, or subcontracted, swimming pool construction, work on gas lines, alarm

installation, or roofing.  (Vaughn Decl. Exh. 1, pg. 8, question 29.)

33.    A. Glassell knows that the litigation arising from his construction of the Lin house involves roofing defects and deficiencies.  (Selvin Decl. Exh. 1 pg. 36- 37 [A. Glassell Depo. pgs. 166:25-167:4].)

34.    The application (Vaughn Decl. Exh. 1, pg. 7, question 22) said Glassell Development Inc. does not perform work above two stories in height, but the Lin house was a three-story house (Selvin Decl. Exh. 1 pg. 9 [A. Glassell Depo. pg. 21:2-6]) and one of the homes built in the Palos Verdes Estates was three stories.  Selvin Decl. Exh. 1 pg. 22- 24 [A. Glassell Depo. pgs. 58:23-60:1].)

35.    In the application, J. Glassell and Glassell Development, Inc. represented that Glassell Development Inc. never worked as a construction manager or project manager or supervised others for a fee from 2001 to the present (Vaughn Decl. Exh. 1, pg. 7, question 25.)  In fact, A. Glassell/Glassell Development Inc. performed construction management and supervised other contractors paid by a different entity.  (Selvin Decl. Exh. 1 pg. 21; pgs. 19-20 [A. Glassell Depo. pgs. 52:2-17; 45:16-46:3]), a fact which both A. and J. Glassell knew.  (Depo. of A. Glassell, pg. 109:16-110: 12.)

**C.      Intent of Policy Applications**

36.    When J. Glassell filled out the applications for the Navigators insurance policy, it was based upon his masonry business only.  It did not include any reference to or information regarding work performed by Glassell Development,

Inc. (Selvin Decl. Exh. 2 pg. 48 [J. Glassell Depo. pg. 17:6-19].)

37. J. Glassell never discussed any of Glassell Development, Inc.'s jobs, subcontracting processes, revenue, or anything of that sort. (Selvin Decl. Exh. 2 pg. 48 [J. Glassell Depo. pg. 17:15-23].)

38. When J. Glassell applied for coverage with Navigators starting in July of 2002, he was seeking coverage for his masonry business rather than A. Glassell's business in home building. (Selvin Decl. Exh. 2 pg. 49 [J. Glassell Depo. pg. 18:8-12].)

39. In J. Glassell's mind, there were two distinct entities, Glassell Development, Inc. and Glassell Construction. The former is A. Glassell's house-building business; the latter is J. Glassell's masonry business. (Selvin Decl. Exh. 2 pg. 44-45 [Depo. of J. Glassell, pgs. 9:9-10:25].)

40. J. Glassell operated his business in Costa Mesa; A. Glassell and Glassell Development, Inc. operated its business in Long Beach. (Selvin Decl. Exh. 2 pg. 46 [J. Glassell Depo. pg. 14:4-19].)

41. J. Glassell never disclosed to his broker, David Toms ("Toms"), that he intended to obtain coverage for his brother's general contracting business. (Selvin Decl. Exh. 2 pg. 50 [J. Glassell Depo. pg. 29: 15-20].)

42. Toms was the president of the brokerage, Newport-Irvine Insurance Brokerage from January 2, 2002 to the present. (Toms Decl., pg. 1:24-27.) He started working with J. Glassell in approximately 1987, when J. Glassell informed him he was a

1 sole proprietor operating a construction business in masonry and
2 concrete.  (Toms Decl., pgs. 2:28 – 3:3.)  J. Glassell further
3 informed Toms in 1996 or 1997 that he was incorporating the
4 business.  J. Glassell informed him that there was no change in
5 the scope of the business operations and that the business was
6 principally limited to masonry and concrete work.  (Toms Decl.
7 pg. 3:4-7.)

8      43.  Toms never spoke to A. Glassell until September 6,
9 2005, when A. Glassell said he'd been sued by the Terajimas.
10 Toms told A. Glassell that the Navigators policy covered masonry
11 and concrete work for subcontractors.  (Toms Decl. pg. 3:22-27.)

**D.      NIC Insurance Policies**

13      44.  NIC issued three consecutive Commercial General
14 Liability insurance policies to Glassell Development, Inc.
15 ("Glassell"), which is identified as a General Contractor ("the
16 NIC policies").[3]  The NIC policies, GS204040, GS307384, GS410787,
17 and GS514239 were in effect from July 1, 2002 to July 1, 2006.
18 (Docket Doc. 1 [Second Am. Compl., pgs. 2:17-3:1]; Docket Doc. 70
19 [Answer to Countercl., pg. 2:9- 19]; Countercl. Ex. 8.)

20      45.  It issued policies to J. Glassell d.b.a. Glassell
21 Construction from July 1, 2006 to the present.  (Docket Doc. 70,
22 pg. 2:17-20.)

23      46.  NIC had an absolute prohibition against issuing

---

[3] Defendant NIC Insurance Company issued the three policies at issue.  Both NIC Insurance Company and Navigators Insurance Company are subsidiaries of The Navigators Group, Inc.  See, Notice of Interested Parties (Docket Doc. 6).  The Complaint does not distinguish between the two for any basis of liability, so this Motion treats the two entities as the same for the purposes of this summary judgment motion.

insurance policies to contractors who acted as construction managers or supervised others for a fee. (Vaughn Decl. pgs. 3:25-4:15.)

47. For general contractors, NIC's protocol was to audit their books and records to make sure they were obtaining additional insured endorsements from their subcontractors. (Vaughn Decl. p. 4). If an insured is acting as a general contractor who does not require insureds to name it as an additional insured, NIC will not quote a premium and will not issue a policy. (Vaughn Decl. pgs. 4:16-5:4.)

48. The slope of the lots on which Glassell built also did not qualify for NIC to issue a policy under its guidelines. (Vaughn Decl. pg. 5:5-13.)

49. NIC also would not have issued a policy for the reason that the home-building operation was not an ongoing operation. (Vaughn Decl. pg. 5:14-22.)

50. Even assuming NIC would have written a policy, if Glassell sought insurance coverage, and disclosed in its application that it had built enormous custom single-family homes, three stories in height, on hillsides, requiring retaining walls and structural designs, and if all of the disclosures had been accurate in the application, and if it obtained additional insured endorsements, and if it did not act as a construction manager, and if it did not build on excessively steep slopes, NIC would have charged three to five times the premium to insure it, approximately $75,000 per year, rather than $15,000-$27,000 for the masonry risk represented in the applications. (Vaughn Decl. pgs. 5:23-6:5.)

**E.      Lin and the Lawsuit**

51.     Glassell entered into a prime contract with the Lins to design and build a home in Palos Verdes Estates.  It then entered into subcontracts with various subcontractors.  According to A. Glassell, the subcontractors on that job included StudioCast Designs, Action Roofing, Battaglia, Inc., Lucien Plumbing and Madden Construction.  The home was completed in either 2000 or 2002.  (Docket Doc. 11, pgs. 47-48.)

52.     On November 13, 2006, the Soltanis filed suit against Glassell and StudioCast.  Ebrahim and Ahdieh Soltani allege they purchased the Lin residence in April 2006.  About one month later, they noticed a small stain on the deck.  Upon further investigation, they found "extensive structural damage due to the leaks on the deck," as well as "mold taking hold in this portion of the structure."  They found additional leaks at a tub, French doors, the roof, decks, and improper installation of flashing and drainage systems.  They alleged five causes of action for breach of the implied warranty of fitness, breach of the implied warranty of quality, strict liability in tort, negligent construction and nuisance.  (<u>Soltani v. Andrew Glassell, et al</u>., Los Angeles Superior Court No. YC054181 ("Soltani Action"), (Compl. Exh. 1).)

**F.      Additional Relevant Facts**

53.     J. Glassell changed the name on his insurance application because he obtained his own license.  (Cornblum Decl., Ex. 21, J. Glassell Depo., p. 87.)  Prior to that, in the 2002 Application, J. Glassell provided the license number 489443.  (Vaughn Decl. Ex. 1, p. 4.)  On January 16, 2006, NIC recognized

13

a name change in the policy from Glassell Development, Inc. d.b.a. Glassell Construction to John Glassell d.b.a. Glassell Construction.  (Cornblum Decl., Ex. 41.)

54.   J. Glassell installed retaining walls between three feet and eight feet in height.  (Cornblum Decl., Ex. 21, J. Glassell Depo., p. 34.)  J. Glassell indicated that his answer should have been "yes" for retaining walls.  (Id. at p. 131.)  An NIC inspection report for an inspection that occurred on July 31, 2003 indicates that "[t]he insured will also build retaining walls . . ."  (Cornblum Decl., Ex. 37, p. 1608.)

55.   An earlier NIC inspection report, dated July 29, 2002, states that "[r]eportedly, the insured receives certificates of liability insurance from all subcontractors, however, does not require naming Glassell Construction as an additional insured, and Mr. Glassell did not know what limits of liability coverage are."  (Cornblum Decl., Ex. 36, p. 255.)  Based on this report, on November 15, 2002, NIC requested a written confirmation that the Insured will require all subcontractors to name him as an additional insured.  (Cornblum Decl., Ex. 34.)  On December 3, 2002, J. Glassell wrote a letter to NIC indicating that he seldom contracts with subcontractors but if he does do in the future he will use a formal contract with the provisions NIC required.  (Cornblum Decl., Ex. 35).

56.   Another inspection report, dated July 19, 2004, provides "[t]he insured is named as additionally insured on [subcontractor's] policies.  It is stated that the use of written contracts is not the standard course of action due to short duration of hire."  (Cornblum Decl., Ex. 38.)  Vaughn testified

14

that a policy would like not be rescinded if the insured uses subcontractors less than 1% of the time and failed to either obtain an additional insured endorsement or written contracts. (Cornblum Decl., Ex. 25, Vaughn Depo., pp. 137-139.)

57. Since June 28, 2002, Glassell did not build any new homes. (A. Glassell Decl. p. 8). All of the homes that A. Glassell did build, took longer than 12 months to construct, usually one and a half to two years. (Id.) There are no questions on the application, however, regarding homes that take longer than one year to build. (Cornblum Decl., Ex. 25, Vaughn Depo., pp. 41-42.)

58. After A. Glassell stopped building new homes, he began working as a site supervisor. On these projects, A. Glassell did not have the authority to hire or fire anyone. (Cornblum Decl., Ex. 31, A. Glassell Depo., p. 216.) But he was responsible for making sure the subcontractors showed up and did their work as well as answering questions and keeping the different parties informed. (Id. p. 210.) A. Glassell did not expect NIC policies to provide liability insurance for his supervisory activity. (Id. pp. 217-218.)

59. On October 14, 2005, NIC sent a denial of coverage letter to plaintiffs. (Cornblum Decl., Ex. 40.) It is related to a claim against plaintiffs filed by the Terajimas. The letter provides that the project "was a substantial project involving almost 50% of the home and involved using all subcontractors to do the work. . . . However, in the mid-year of 2003 there was a disagreement between the Terajima's [sic] and Andrew Glassell over the work scheduling . . . and Glassell Development, Inc. was

terminated as the general contractor." (Id.)

## II.

## **CONCLUSIONS OF LAW**

California law provides that NIC is entitled to rescind the NIC policies, as they were procured upon misrepresentations and the concealment of material facts. California Insurance Code, § 331 provides that "[c]oncealment, whether intentional or unintentional, entitles the injured party to rescind insurance." The California Insurance Code provides that an insurer has a right to know all that the applicant for insurance knows regarding the risks to be assumed. California Insurance Code § 332 provides as follows:

> Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining.

California Insurance Code § 359 also provides that a false representation on a material point entitles the injured party to rescind the contract. Pursuant to California Insurance Code § 334, whether a misrepresentation or concealment is material is "determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries."

           The fact that an insurer asks a question in an insurance application (or questionnaire) suffices to establish materiality as a matter of law. Old Line Life Ins. Co. of Am. v. Superior Court, 229 Cal. App. 3d 1600, 1603-1604, 281 Cal. Rptr. 15 (1991). Moreover, California courts apply a subjective standard to this issue, necessitating an inquiry as to what effect accurate information would have had upon NIC, as opposed to a hypothetical insurer. Robinson v. Occidental Life Ins., 131 Cal. App. 2d 581, 586, 281 P.2d 39 (1955); Imperial Cas. & Indem. Co. v. Sogomonian, 198 Cal. App. 3d 169, 243 Cal. Rptr. 639 (1988); Merced County Mut. Fire Ins. Co. v. Cal., 233 Cal. App. 3d 765, 772, 284 Cal. Rptr. 680 (1991).

           The issue of materiality "is determined by the probable and reasonable effect upon the insurer" (Cal. Ins. Code § 334), and the misrepresentation need not relate to the loss openly claimed by the policyholder. Mitchell v. United Nat'l Ins. Co., 127 Cal. App. 4th 457, 474, 25 Cal. Rptr. 3d 627 (2005). Here, however, the misrepresentation directly related to the construction of the Lin home, which is the subject of the underlying suit against plaintiff.

           Dozens of questions on each application each year sought written answers to identify the scope of the risk. The questions and answers are material as a matter of law. Cohen v. Penn Mut. Life Ins. Co., 48 Cal. 2d 720, 726, 312 P.2d 241 (1957). Truthful information would have caused the underwriter to reject the application.

           The purpose of the materiality inquiry is to make certain that the risk insured was the risk agreed upon. If a

17

fact is material to the risk, the insurer may avoid liability under a policy if the fact was misrepresented or concealed in an application for that policy. Id. at 772.

Waiver exists when the insurer intentionally relinquishes its right to rely on an exclusion. See Prudential-LMI Commercial Ins. v. Superior Court, 51 Cal. 3d 674, 689, 274 Cal. Rptr. 387 (1990). Waiver is the intentional relinquishment of a known right, and is a unilateral act that depends on the intention of the "waiving" party. Morgan v. Int'l Aviation Underwriters, Inc., 250 Cal. App. 2d 176, 58 Cal. Rptr. 164 (1967). If the insured makes multiple misrepresentations, waiver regarding one of the misrepresentations does not prevent rescission of the policy. Mitchell, 127 Cal. App. 4th at 476-77. The burden of proof belongs to the party arguing that a waiver occurred, and doubtful cases are decided against waiver. CBS Broad. Inc v. Fireman's Fund Ins. Co., 70 Cal. App. 4th 1075, 1085, 83 Cal. Rptr. 2d 197 (1999). NIC did not waive its right to rescind the contracts because it did not have sufficient notice of Glassell's previous homebuilding activities and when it did obtain such information, it no longer issued policies to it.

//
//
//
//
//
//
//
//

1  The Court finds, as a matter of law, that there were
2 material misrepresentations in each of the applications submitted
3 by counter-defendants. NIC did not waive its right to rescind
4 the contracts. The NIC policies issued to Glassell Development,
5 Inc. d.b.a. Glassell Construction, are therefore entitled to be
6 upon remission to plaintiffs of all premiums paid.
7  DATED: June 30, 2009.

___ALICEMARIE H. STOTLER___<br>ALICEMARIE H. STOTLER<br>UNITED STATES DISTRICT JUDGE